**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ALYSSA MCGHEE,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:10-CV-424-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pursuant to the consent of the parties and the District Court's *Order of Reassignment*, dated May 10, 2010, this case has been transferred for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). Before the Court are *Plaintiff's Opening Brief*, filed May 26, 2010, and *Commissioner's Motion for Summary Judgment*, filed June 18, 2010. Based on the relevant filings, evidence, and applicable law, the Commissioner's motion is **DENIED**, and the case is **REVERSED** and **REMANDED** to the Commissioner for reconsideration.

## I. BACKGROUND[1]

### A.    Procedural History

Alyssa Mcghee ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II and Title XVI of the Social Security Act. On June 14, 2007, she filed for disability insurance benefits and supplemental security income payments, claiming that she had been disabled since April 1, 2006

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

due to lupus, arthritis, and a heart defect.  (Tr. at 105-09, 121.)  Her application was denied initially

and upon reconsideration.   (Tr. at 56, 58.)   Plaintiff timely requested a hearing before an

Administrative Law Judge ("ALJ").  (Tr. at 77-78.)   She personally appeared and testified at a

hearing held on October 28, 2008.  (Tr. at 26-27.)  On March 30, 2009, the ALJ issued his decision

finding Plaintiff not disabled.  (Tr. at 25.)  On December 31, 2009, the Appeals Council denied

Plaintiff's  request  for  review,  and  the  ALJ's  decision  became  the  final  decision  of  the

Commissioner.  (Tr. at 1-4.)  On March 2, 2010, Plaintiff timely appealed the Commissioner's

decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.**     **Factual History**

       **1.**     **Age, Education, and Work Experience**

Plaintiff was born on June 1, 1989, was 16 years old on her alleged onset date, and was 19

years old at the time of the hearing before the ALJ.  (Tr. at 108.)  She has a high school education,

(Tr. at 23), but no past relevant work, (Tr. at 17, 23).

       **2.**     **Medical Evidence**

Plaintiff's medical evidence shows that she has consistently been diagnosed with rheumatoid

arthritis [2] and sjogren's syndrome since 2001.  (Tr. at 194, 246.)  In July 2005, Plaintiff was seen

at the Texas Scottish Rite Hospital for Children ("Scottish Rite"), where a physician noted that she

---

[2]  Rheumatoid arthritis is an inflammatory disease that causes pain, stiffness, swelling, and loss of function
in the joints, and can affect and cause inflammation in other areas of the body.  It can inflame the glands of the eye
and mouth causing dryness of these areas (referred to as sjogren's syndrome); it can also inflame the lung lining
causing chest pain with deep breathing, shortness of breath, or coughing.  The disease generally involves periods of
relatively mild activity punctuated by flares, or times of heightened disease activity.  During these flares, the lining
of the joint becomes inflamed resulting in the thickening of the lining, a phenomena referred to as synovitis, and
symptoms can include fatigue, loss of energy, lack of appetite, low-grade fever, muscle and joint aches, and stiffness
that is most notable in the morning.  *See* http://www.medicinenet.com/rheumatoid_arthritis/page2.htm (last visited
July 15, 2010), and National Institute of Arthritis and Muskoloskeletal Diseases,
http://www.niams.nih.gov/Health_Info/Rheumatic_Disease/default.asp (last visited July 15, 2010) for this
information.

had sjogren's syndrome and a history of migraine-like headaches, and she was taking medication for joint pain and other unspecified pains. (Tr. at 197.) He noted, however, that her complaints of headaches had subsided, and she seemed to be doing very well, was working part-time, and had played soccer during the school year. (*Id.*) On February 15, 2006, another physician from Scottish Rite noted that Plaintiff had recently been hospitalized for a week due to a zoster infection and had been placed on forty-eight hours of intravenous antibiotics and fluids. (Tr. at 200.)

The following month, in March 2006, physicians from Scottish Rite noted that Plaintiff had generally been complaining of wrist pain, hand pain, ankle or mid-calf pain, and morning stiffness which occasionally required her to stop and un-stiffen her joints when writing or using a computer. (Tr. at 201.) Upon examination, they noted that her joints were normal and she did not have any stiffness or limitations; she was unable, however, to totally extend her elbows due to a recent injury. (Tr. at 201-02.) They reported that she was on medication and had been playing soccer the past two weeks. (Tr. at 201.) On August 14, 2006, Plaintiff visited Scottish Rite again with complaints of morning stiffness lasting ten to fifteen minutes, dry eyes, and dry mouth. (Tr. at 203.) A physician noted that she had normal muscle strength, a full range of motion, and no swelling in her joints, and that she was not using her medication. (*Id.*)

On September 20, 2006, Plaintiff saw Dr. Andres Quiceno, M.D., for an evaluation of her joint problems, sjogren's syndrome, and juvenile arthritis. (Tr. at 194-95.) Upon examination, Dr. Quiceno noted that she had no deformity, effusion, synovitis, or nodules in her joints, had a normal range of motion, had no limitations overall, and was not disabled; he noted, however, that she had a tender right knee and a tender and swollen joint. (Tr. at 195.) He encouraged her to stretch before exercise and started her on a new medication regimen. (*Id.*) On February 1, 2007, Plaintiff complained of morning stiffness lasting fifteen minutes, and arthritis pain in her chest and right

knee.  (Tr. at 295.)  Dr. Quiceno recommended medication and dose packs.  (Tr. at 294.)  On February 6, 2007, Plaintiff returned to Scottish Rite with complaints of headaches "associated with a flare," and reported increasing difficulty with attention and short-term memory loss.  (Tr. at 205-06.)  She stated that she was very active in school and was participating in track.  (Tr. at 205.)  On June 14, 2007, upon referral from Scottish Rite, Dr. Ronald W. Anderson, PH.D, P.C., diagnosed Plaintiff with borderline intellectual functioning, but noted that she drove, worked park-time, enjoyed school, and was active in soccer and track.  (Tr. at 205, 208-211.)

On June 28, 2007, Plaintiff returned to Dr. Quiceno with complaints of arthritis pain and morning stiffness lasting thirty to forty-five minutes.  (Tr. at 288, 292.)  He noted that her rheumatoid arthritis was improving, but she had synovitis in her joints and tenderness in her knees. (Tr. at 288.)  On July 26, 2007, Plaintiff saw Dr. Quiceno for arthritis pain in her fingers, wrists, and feet, and morning stiffness lasting forty-five minutes.  (Tr. at 399.)  He noted that Plaintiff had swollen hands, sore hands and feet, and synovitis in her MCP and PIP joints, but good range of motion.  (Tr. at 398.)  He classified her rheumatoid arthritis as mildly active.  (*Id.*)  On September 6, 2007, Dr. Quiceno noted that Plaintiff had multiple tender points, but all her joints were within normal limits with no synovitis, and her rheumatoid arthritis was in excellent control.  (Tr. at 394.) On October 11, 2007, he noted that Plaintiff's rheumatoid arthritis was under good control, her sjogren's syndrome was stable, and she had no joint pains or synovitis.  (Tr. at 391.)

On April 16, 2008, Plaintiff saw her treating physician, Dr. Kurt Pfleiger, at Rockwall Pediatrics with complaints of fever, chills, body aches, and loss of appetite.  (Tr. at 344.)  Dr. Pfleiger noted swelling in her neck that was tender to palpation and reported that she had been diagnosed with flu, pneumonia, tonsillitis, and sinusitis two weeks earlier and had been sick off and on since then.  (Tr. at 344.)  He diagnosed her with influenza and mycoplasma pneumonia and

referred her to Lake Pointe Hospital for admission.  (*Id.*)  During her hospitalization, she was noted to be "feverish along with hand and joint pain" and "ongoing increased constant pain."  (Tr. at 303, 338-39.)  Plaintiff was discharged five days later on April 21, 2008.  (Tr. at 338.)  Her discharge diagnoses were listed as acute tonsilitis and "juvenile rheumatoid arthritis and sjogren's flare, improved."  (*Id.*)  On April 23, 2008, Dr. Quiceno examined her joints and noted that she had no synovitis but multiple tender joints.  (Tr. at 387.)  He explained that it was very important to be compliant with medication and follow up with laboratory work.  (Tr. at 390.)

On May 20, 2008, Dr. Pfleiger noted a knot on the right side of Plaintiff's neck that was painful to the touch and lasted four days.  (Tr. at 336.)  He diagnosed her with acute pharyngitis, sialoadenitis, and sjogren's syndrome.  (*Id.*)  The next day, Dr. Quiceno noted tenderness and swelling in her right parotid area, but noted that she had no swollen or tender joints, no synovitis, and normal range of motion.  (Tr. at 384.)  He stated that Plaintiff's rheumatoid arthritis and sjogren's syndrome were under "excellent control," but she had a recurrent parotid inflammation that could be related to her sjogren's syndrome.  (*Id.*)

On June 5, 2008, Dr. Pfleiger saw Plaintiff for a rapid onset of left parotid swelling and a very painful and swollen left jaw.  (Tr. at 334.)  He noted that she had no joint pain, swelling or limitation of motion, but she seemed very ill and uncomfortable in appearance.  (*Id.*)  Upon hospitalization that day, Plaintiff was noted to have "a rapid increase in the size of her left parotid and submandibular glands" with no fever but "exquisite tenderness and trismus."  (Tr. at 331.)  A CT scan of the soft tissue of her neck revealed two enlarged lymph nodes "located inferior to the left parotid gland" with a "small amount of adjacent inflammation."  (Tr. at 331, 333.)  She was discharged two days later on June 7, 2008, with diagnoses of left parotitis, sjogren's syndrome with acute exacerbation, juvenile rheumatoid arthritis, immunocomprised secondary to chronic steroid

administration, and atrioseptal defect secundum.  (Tr. at 331.)

On November 6, 2008, Dr. Quiceno filled out an interrogatory asking him to decide whether Plaintiff was reasonably likely to miss an average of more than three days of work per month due to her multiple medical conditions. (Tr. at 358.) Dr. Quiceno answered in the affirmative. (*Id.*) On December 12, 2008, Dr. Pfleiger made the same response to an identical interrogatory. (Tr. at 361.) On January 1, 2009, Plaintiff reported a swollen and tender knee to Dr. Quiceno after falling and cutting herself on a bottle cap. (Tr. at 369.)  On March 30, 2009, Plaintiff saw Dr. Quiceno again and complained of headaches, body aches, sore throat and discomfort in her chest. (Tr. at 365.) Dr. Quiceno noted that Plaintiff had hyperpyrexia, headache, sinusitis, and nasopharyngitis. (*Id.*) He noted that the range of motion in her neck was normal and painless.  (*Id.*)  On April 29, 2009, Plaintiff saw Dr. Quiceno with complaints of arthritis pain in her shoulders, arms, knees and back, dry eyes and mouth, cough, shortness of breath, swollen feet, headaches, loss of memory, depression, poor sleep, and morning stiffness lasting thirty minutes. (Tr. at 382.) Dr. Quiceno noted that Plaintiff had been non-compliant with her medication for a while.  (Tr. at 381.)  Upon examination, he noted a limited range of motion in her elbow and mild synovitis in her PIP joints. (*Id.*)

On May 27, 2009, Plaintiff saw Dr. Quiceno for arthritis pain in her shoulder and arms, morning stiffness lasting one hour, and poor sleep. (Tr. at 379.)  Dr. Quiceno noted that Plaintiff had tenderness in her joints, and that her rheumatoid arthritis was still active. (Tr. at 378.) On June 22, 2009, Plaintiff visited Dr. Quiceno again with complaints of arthritis pain in her arms, swelling in her feet, headaches, difficulty sleeping, and morning stiff ness lasting one hour. (Tr. at 376.) Dr. Quiceno noted that she had eight swollen and eighteen tender joints. (Tr. at 375.) On July 13, 2009, Plaintiff saw Dr. Quiceno again with complaints of discomfort in her hands, arms, and feet due to

arthritis, swollen feet, headaches, difficulty sleeping, and morning stiffness lasting thirty minutes. (Tr. at 373.)  He noted that she had morning stiffness, but that her arthritis was stable, and that she was sleeping well and had no swollen or tender joints.  (Tr. at 372.)

### 3.    Hearing Testimony

The ALJ held a hearing on October 28, 2008.  (Tr. at 26.)  Plaintiff appeared personally and was represented by an attorney.  *Id.*

#### a.  Plaintiff's Testimony

Plaintiff testified that she had previously worked part-time at Target, Bass Pro and 24 Hour Fitness.  (Tr. at 32, 41.)  Her current job involved billing and filing work at a doctor's office for about ten hours a week.  (Tr. at 31.)  On a typical day, she got up around 9:30 a.m., made something to eat, watched TV, went to work around 2:00 p.m., got off work around 8:00 or 9:00 p.m., and went to bed around 10:00 p.m.  (Tr. at 41.)  She only did dishes around the house, didn't drive and didn't have a driver's license.  (Tr. at 42.)  She felt tired and weak even on a regular day.  (Tr. at 39.)

She testified that she was disabled from working because once or twice a month, she got "flare-ups" caused by her juvenile arthritis and sjogren's syndrome.  (Tr. at 32, 33.)  The flare-ups lasted anywhere from one week to two weeks, and during that time, she had morning stiffness and swollen joints, and could not lift things, walk around a lot, or stand on her feet for a long time.  (Tr. at 32, 34.)  The joint swelling usually occurred in her hands and feet , (Tr. at 37), sometimes to such an extent that it was hard to fit her feet into her socks or shoes, (Tr. at 40).  She found it hard to get out of bed in the morning, (Tr. at 34), and did not go out with her friends, (Tr. at 38).  Some days she did not get out of bed at all, but she had not experienced those days in a while.  (Tr. at 38.) During her flare-ups, she did not leave her house because of pain, weakness and fatigue.  (Tr. at 39.) Sometimes, she could be fairly active during her flare-ups.  (Tr. at 37.)  Her medication was able to

control her condition, except that during her flare-ups she still felt pain.  (Tr. at 33, 36.)

Plaintiff testified that she had been sick throughout high school and had to "do Friday schools" and get homework sent home through her parents.  (Tr. at 35.)  Her grades were only held back in fifth grade.  (Tr. at 35.)  During her senior year, she was hospitalized for two to three weeks for flu and pneumonia.  (Tr. at 34-35.)  Plaintiff stated that she could work a forty-hour work week if she was not sick, but she could not predict her flare-ups or the number of days she would miss on average because of them.  (Tr. at 51.)  She testified that she had missed almost a month of work during her one year job at Target.  (Tr. at 33.)  She responded in the affirmative when the ALJ asked her if it was fair to say that she had good days and bad days.  (Tr. at 51.)

### b.  Medical Expert's Testimony

Two medical experts, Dr. Charles Murphy and Dr. Albert Smith, also testified at the hearing.  (Tr. at 43-47.)

Upon examination by the ALJ, Dr. Murphy testified that Plaintiff had been diagnosed with sjogren's syndrome and juvenile rheumatoid arthritis.  (Tr. at 43.)  She had problems with dry eyes, dry mouth, dental caries, arthralgias, and fatigue.  (Tr. at 43.)  She had been treated with immuno-suppressants with "pretty good results."  (Tr. at 43.)  None of her impairments met or equaled the listings.  (Tr. at 44.)  Dr. Murphy testified that Plaintiff's medical conditions would be expected to result in limitations in her ability to function.  (Tr. at 44.)  Because of her issues with her fatigue and arthralgias, she would be limited to a sedentary occupation.  (Tr. at 44.)  Dr. Murphy recommended that she have minimal exposure to small children and crowds, and that she not work with many different people, as in a sales position.  (Tr. at 44.)  Dr. Murphy testified that he did not really get from the record that Plaintiff experienced flare-ups.  (Tr. at 45.)  There were two hospitalizations, but he could not really get a good feel for whether there might be any missed days during a given

- 8 -

month in terms of exacerbation of symptoms. (Tr. at 45.) Upon examination by Plaintiff's attorney, Dr. Murphy testified that the tooth decay and the issues with the parotid gland were related to Plaintiff's sjogren's syndrome. (Tr. at 45.)

Dr. Smith, a clinical psychologist, testified that the only mental impairment suggested by the record was borderline intellectual functioning. (Tr. at 47.) He stated that based on her low IQ score during a psychological evaluation, which he believed was a little suspect given her high achievement in school, Plaintiff would potentially be limited to non-complex tasks. (Tr. at 47.)

### c. *Vocational Expert's Testimony*

A vocational expert ("VE") also testified at the hearing. (Tr. at 47-50.) The VE testified that Plaintiff's record did not reflect any substantial gainful activity. (Tr. at 48.)

The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education, and work experience who could occasionally lift or carry ten pounds; frequently lift or carry less than ten pounds; stand or walk for at least two-hours of an eight-hour workday; sit for six-hours in an eight-hour workday; and was limited to simple routine tasks consistent with unskilled work; and had no more than occasional contact with the general public. (Tr. at 49.) The ALJ then asked the VE to opine whether such a person would be able to perform any jobs existing in the economy. (*Id.*) The VE testified that the hypothetical individual would be able to perform the jobs of an optical goods assembler, cutter and paster, and a hand mounter, all of which are sedentary and unskilled with an SVP of 2. (Tr. at 49.) Upon cross-examination by Plaintiff's attorney, the VE testified that such an individual would not be able to maintain competitive employment if she would potentially miss up to one month's time over the period of a year. (Tr. at 50.) The VE opined that missing only one day a month would generally be acceptable to maintain employment. (*Id.*)

**C.**     **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 30, 2009.  (Tr. at 15-24.)  He found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 17, ¶ 2.)  He also found that Plaintiff suffered from the severe impairments of sjogren's syndrome, borderline intellectual functioning, and rheumatoid arthritis, but concluded that these impairments did not meet or medically equal a listed impairment.  (Tr. at 17-18, ¶¶ 3, 4.)  The ALJ limited Plaintiff's residual functional capacity ("RFC") to lifting and carrying ten pounds occasionally and less than ten pounds frequently, standing or walking for at least two hours of an eight-hour workday, sitting for six hours in an eight-hour workday, and performing simple routine tasks with no more than occasional contact with the general public.  (Tr. at 19, ¶ 5.)  He found that Plaintiff had no past relevant work, but her RFC would allow her to perform jobs that existed in significant numbers in the economy.  (Tr. at 23, ¶¶ 9-10.)  He concluded that Plaintiff had not been disabled since the alleged onset date through the date of his decision.  (Tr. at 24, ¶ 11.)

## II.  ANALYSIS

**A.**     **Legal Standards**

**1.**     **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985).  The relevant law and regulations governing the determination of

disability under a claim for disability insurance benefits are identical to those governing the

determination under a claim for supplemental security income.  *See id.*  The Court may therefore rely

on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id.*

2.      **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638,

640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and grant judgment on her

behalf, and in the alternative, remand for further proceedings.  (P. Br. at 1.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.).  The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005).  The Commissioner, not the court, resolves evidentiary conflicts.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.   Issues for Review**

Plaintiff identifies the following issues for review:

(1)   Did the ALJ make a finding as to whether Plaintiff could sustain full-time work as required by *Watson v. Barnhart*;

(2)   Did the ALJ evaluate Plaintiff's treating physician's opinions in accordance with Fifth Circuit case law and the Commissioner's own regulations;

(3)   Is the ALJ's adverse credibility finding supported by substantial evidence?

(Pl. Br. at 2.)

**C.   Issue One: Maintaining Employment**

Plaintiff asserts that the ALJ failed to determine whether she could maintain long-term employment, and that the ALJ was required to so in determining whether she could engage in substantial gainful activity.  (P. Br. at 11.)

A finding that a social security claimant is able to engage in substantial gainful activity requires "more than a mere determination that the claimant can find employment and that he can

physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986); *see also Leidler v. Sullivan*, 885 F.2d 291, 292-93 (5th Cir. 1981). This requirement extends to cases involving mental as well as physical impairments. *Watson v. Barnhart*, 288 F.3d 212, 217-218 (5th Cir. 2002). The requirement is not universal, however; the ALJ is not required in every case to make specific and distinct findings that the claimant can maintain employment over a sustained period. *Frank v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). An RFC determination itself encompasses the necessary finding unless the claimant's ailment, by its nature, "waxes and wanes in its manifestation of disabling symptoms." *See id*; *Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005). A specific finding is required if there is "evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Allegations that an impairment causes good days and bad days do not by themselves require an explicit finding on maintaining employment. *See Perez*, 415 F.3d at 465.

Here, the ALJ did not make a finding that Plaintiff would be able to maintain for a sustained period. Plaintiff has rheumatoid arthritis, a disease that by its very nature is prone to flare-ups and affects not only joints but other areas of the body as well. Additionally, there is evidence in the record that Plaintiff experienced flare-ups related to her rheumatoid arthritis and sjogren's syndrome. On many different occasions, Plaintiff complained to her physicians that she had headaches "associated with a flare," difficulty with attention, arthritis pain in different areas of her body, morning stiffness, dry eyes and mouth, swollen feet, loss of memory, depression, and poor

sleep.  (Tr. at 201, 205-06, 288, 292, 376, 379, 399, 382.)  Dr. Quiceno's observations during some

of these visits included a tender right knee and a tender joint (Tr. at 95), synovitis in her joints and

tenderness in her knees (Tr. at 288), swollen hands, sore hands and feet, and synovitis in her MCP

and PIP joints (Tr. at 399), multiple tender joints (Tr. at 387), tenderness in her joint with "still

active" rheumatoid arthritis (Tr. at 378), and eight swollen and eighteen tender joints (Tr. at 375).

During other visits, he observed that Plaintiff's rheumatoid arthritis was stable and under good

control, her sjogren's syndrome was stable, and she had no joint pain or synovitis.  (*See e.g.* Tr. at

372, 391, 394.)

The medical record shows that Plaintiff was hospitalized at least three different times.  (Tr.

at 200, 344.)  One of these hospitalizations was for flu and pneumonia like symptoms, and Plaintiff

was noted to be "feverish along with hand and joint pain" and "ongoing increased constant pain."

(Tr. at 303, 344, 338-39.)  Her discharge diagnoses after a five-day hospitalization consisted of acute

tonsilitis and "juvenile rheumatoid arthritis and sjogren's flare, improved."  (Tr. at 338.)  On another

occasion, Plaintiff was hospitalized for two days for a "rapid increase in the size of her left parotid

submandibular glands" with no fever but "exquisite tenderness and trismus."  (Tr. at 331.)  Prior to

this hospitalization, Dr. Quiceno had noted that Plaintiff had a recurrent parotid inflammation that

could be related to her sjogren's syndrome.  (Tr. at 384.)  A medical expert testified at the hearing

that the issues with Plaintiff's parotid gland were related to her sjogren's syndrome.  (Tr. at 45.)

Plaintiff also testified at the hearing that she experienced flare-ups.  She stated that she had

been absent about a month over the course of her one-year part-time job at Target. (Tr. at 33.)  Her

attorney also made an argument to the ALJ that Plaintiff was likely to experience flare-ups, and that

the resulting overall absenteeism over the course of the year would exceed a potential employer's

tolerance.  (Tr. at 52-54.)  The VE testified that generally only one day of absenteeism a month was

acceptable to maintain employment on a monthly basis.  (Tr. at 50.)  Plaintiff's treating physicians,

Dr. Pfleiger and Dr. Quiceno also opined that Plaintiff was reasonably likely to miss an average of

more than three days of work per month due to her multiple medical conditions.[3]  (Tr. at 358, 361.)

The ALJ himself cited to the medical expert's testimony that Plaintiff had been hospitalized because

of a flare-up of connective tissue disease.  (Tr. at 21.)  He also acknowledged that there were

incidents of sjogren's syndrome flare-ups requiring hospitalization. (Tr. at 22.)  This evidence goes

beyond merely good days and bad days.  The nature of the impairment, the medical evidence of

record, treating physician opinions, Plaintiff's testimony, and the medical expert's testimony at the

hearing are all evidence that Plaintiff's impairment waxed and waned over the course of her

impairment.  Under these circumstances, the ALJ was required to determine whether Plaintiff could

maintain employment over a sustained period.  By failing to make that determination, the ALJ

committed legal error.  *See Leidler*, 885 F.2d at 292.

Generally, appeals from administrative agencies of a procedural error will not lead to a

vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*,

887 F.2d 630, 634 (5th Cir. 1989) (per curiam)  (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th

Cir. 1988) (per curiam)).  However, a failure to apply the *Singletary* standard is a legal error, not a

---

[3] The Commissioner argues that these opinions were vague and imprecise, were not based on a function by function analysis, and were contradicted by references in the record that Plaintiff had a full range of motion, had no synovitis, and could engage in physical activities.  There is no requirement that the treating physicians perform a function by function analysis to support their opinions. *See* SSR 96-5p, 1996 WL 374183 at *5 (medical source opinion must not be equated with an RFC assessment). If the ALJ was not able to ascertain the basis of their opinions from the case record, he was required to make every reasonable effort to re-contact the treating physicians for clarification for the reasons of their opinion.  *See id.* at *6.  Additionally, the issue here is not whether Plaintiff could obtain employment as an initial matter, but whether Plaintiff could maintain employment over a sustained period.  Therefore, evidence that Plaintiff could function normally for a period of time is not necessarily inconsistent with an opinion that she would not be able to work for a certain time period due to waxing symptoms from her impairment.

procedural error.  The Fifth Circuit has left the lower courts no discretion to determine whether such an error was harmless.  Rather, the court mandated that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial."  *Moore v. Sullivan*, 895 F.2d 1065, 1070 (quoting *Leidler*, 885 F.2d at 294).  In light of the ALJ's legal error, this case is remanded with directions to the ALJ to apply the correct legal standard as set forth in *Singletary*.  Since remand is required on this issue, the Court does not consider the remaining issues for review.

### III.    CONCLUSION

The Commissioner's motion is **DENIED**, and the case is **REVERSED** and **REMANDED** to the Commissioner for reconsideration consistent with this decision.

**SO ORDERED**, on this 21st day of July, 2010.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 17 -